ALYSSA A. QUALLS (IL Bar No. 6292124)
Email: quallsa@sec.gov
MICHAEL FOSTER (IL Bar No. 6257063)
Email: fostermi@sec.gov
BRIAN D. FAGEL (IL Bar No. 6224886)
Email: fagelb@sec.gov
PETER SENECHALLE (IL Bar No. 6300822)
Email: senechallep@sec.gov
175 West Jackson Blvd., Suite 1450
United States Securities and Exchange Commission
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT C. DOBKIN, CYNTHIA BRAUN, MICHAEL FIORILLO, and JEFFREY S. GREGERSEN,<br><br>Defendants, | **COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff United States Securities and Exchange Commission ("Commission" or "SEC") alleges as follows:

## SUMMARY

1. This case involves insider trading in the securities of Linear Technology Corporation ("Linear") in advance of the July 2016 announcement that the company was merging with Analog Devices, Inc. ("Analog").

2. Defendant Robert Dobkin, Linear's Chief Technical Officer and one of its founders, learned of and was involved in the company's merger negotiations, and tipped his close friends,

COMPLAINT

Defendant Cynthia Braun and Defendant Michael Fiorillo about the merger. Fiorillo tipped his friend, Defendant Jeffrey Gregersen, and his sister and brother-in-law.

3. The traders, Defendants Braun, Fiorillo, and Gregersen, as well as Fiorillo's sister and brother-in-law, collectively bought hundreds of Linear call options and thousands of shares of Linear stock in accounts owned or controlled by them leading up to the announcement.

4. On July 26, 2016, a news article reported rumors about a merger between Analog and Linear. Later that day, Linear and Analog issued a joint press release announcing the execution of the merger agreement. The stock closed at $62.49 after the merger was officially announced, which represented a 29% increase over the closing price of Linear's stock the previous day. The next day, on July 27, 2016, the traders sold their Linear options and shares after news of the Linear-Analog merger became public, realizing total illegal profits of more than $325,000.

5. As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6. The Commission seeks a permanent injunction against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], an officer and director bar against Dobkin pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u-1, and 78aa]. In connection with the conduct described herein, Defendants directly or indirectly made use of a means or instrumentality of interstate commerce, or of the mails, or of a facility of a national securities exchange.

8. Venue in the Northern District of California is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b)(1) and (2). Each of the Defendants resides in the District and certain of the acts, practices, and courses of business constituting the

violations of law alleged in this Complaint occurred within this District.

**DIVISIONAL ASSIGNMENT**

9. Assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-2(c) and (e) because a substantial part of the events or omissions giving rise to the SEC's claims occurred in Santa Clara County, and Defendants reside within that county.

**COMMONLY-USED TRADING TERMS**

10. A "call option" is a type of contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying security at a specified price within a specified time. The "strike price" is the price per share at which the option owner can buy the underlying security if he chooses to exercise the option. The "expiration date" is the last day that an option contract is valid. If the option owner chooses not to exercise the option (in other words, not to buy 100 shares of the underlying stock), the option expires and becomes worthless, and the owner loses the money he paid to buy the option.

11. If the strike price of a call option is below the price at which the stock is trading, the call option is considered "in-the-money" because the exercise of the option would allow the holder to make a profit by purchasing the stock at the strike price and selling it for a higher price. If the strike price is above the price at which the stock is trading, the call option is "out-of-the-money" because the exercise of the option to purchase the stock at the strike price and immediate sale of the sock at a lower price would result in a trading loss.

**DEFENDANTS**

12. **Robert C. Dobkin**, age 78, resides in Monte Sereno, California. Dobkin co-founded Linear with four others in 1981 and he served as its Chief Technical Officer until Linear was acquired by Analog in 2016. After the merger, Dobkin served as a consultant to Analog until approximately 2019. Until recently, he served on the board of directors of a publicly-traded Canadian company. Dobkin entered into an agreement to toll or suspend the running of any statute of limitations for a period of 12 months.

13. **Cynthia Braun**, age 51, resides in San Jose, California. Braun works in a hospital as a sonographer. Braun entered into an agreement to toll or suspend the running of any statute of

limitations for a period of six months.

14. **Michael Fiorillo**, age 50, resides in San Jose, California. Fiorillo operates a restaurant in San Jose and a billiards parlor in Santa Clara, California along with his sister. Fiorillo entered into an agreement to toll or suspend the running of any statute of limitations for a period of six months.

15. **Jeffrey S. Gregersen**, age 51, resides in Santa Clara, California. Gregersen entered into an agreement to toll or suspend the running of any statute of limitations for a period of six months.

## RELATED ENTITIES

16. **Linear** is a Delaware corporation with its headquarters in Milpitas, California. Linear designed and manufactured integrated circuits that were used in a variety of applications, including telecommunications, computers and aerospace. Prior to filing a Form 15-12B on March 20, 2017, Linear's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act. During the time relevant to this investigation, Linear's common stock (LLTC) was listed on the NASDAQ stock market ("NASDAQ") and its options were traded on the Chicago Board Options Exchange and other U.S. options exchanges.

17. **Analog** is a Massachusetts company with its headquarters in Wilmington, Massachusetts. Analog manufactures integrated circuits and related products for use in a variety of applications. Analog's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act.

## FACTS

A. **Dobkin Learned Material Non-Public Information about the Merger.**

18. On August 14, 2015, Linear received an unsolicited letter from Analog proposing to purchase Linear. On September 4, 2015, Linear's board of directors voted not to pursue Analog's offer.

19. On March 23, 2016, Analog's CEO informed Linear's executive chairman that Analog remained interested in acquiring Linear and the two exchanged additional communications over the next ten days.

20. On April 5, 2016, Analog submitted a formal offer to Linear's executive chairman via email and Analog's CEO called Linear's executive chairman on the telephone to inform him of the offer.

21. On April 6, 2016, Linear's executive chairman forwarded Analog's formal offer to a Linear director via email and discussed the formal offer with the director by telephone.

22. On April 8, 2016, a Linear director forwarded Analog's formal offer to all of the Linear directors, including its CEO, via email.

23. On or about April 8, 2016, Dobkin learned that Analog had renewed its offer to merge with Linear.

24. Over the next several weeks, Linear's management team and advisors continued engaging in discussions with Analog and a second bidder.

25. In June 2016, Dobkin participated in meetings between the management teams of Linear and Analog about the merger.

26. On June 13, 2016, Linear's CFO sent an email to Linear's board of directors stating that the "Management team" viewed the offer as "embarrassingly low." The CFO then forwarded the email to Dobkin, who responded in a manner that indicated he shared this view of the offer.

27. On June 22, 2016, Analog submitted a final offer to acquire Linear for $60 per share.

28. On July 13, 2016, Linear's board of directors approved the company's entry into an exclusivity agreement with Analog with an exclusive negotiating period until July 26, 2016.

29. On July 20, 2016, members of Linear's management team, including Dobkin, had one-on-one meetings with Analog's CEO in San Jose, California.

30. On July 26, 2016, at 11:23 am PDT, a news article reported rumors of a merger between Analog and Linear. At 11:47 am PDT, NASDAQ halted trading in Linear securities.

31. At 12:35 pm PDT, on July 26, 2016, Linear and Analog issued a press release announcing the merger agreement.

32. Linear's stock had closed at $48.47 per share on July 25, 2016. After news of the transaction became public on July 26, 2016, Linear's stock price reached a high of $64.42. The stock closed at $62.49 after the merger was officially announced. This represented a 29% increase

over the closing price of Linear's stock the previous day.

33. At all times relevant to the allegations in this Complaint, as an officer and employee of Linear, Dobkin owed fiduciary or similar duties of trust and confidence to Linear and its shareholders that prohibited him from disclosing to third parties material non-public information concerning Linear, or from trading on such information.

34. Dobkin knew of, understood, and agreed to abide by Linear's insider trading policy, which expressly prohibited Dobkin from purchasing or selling Linear securities on the basis of material non-public information concerning the company, or from tipping such information to others. Linear's insider trading policy defined "material" to include, among other things, information concerning "news of a pending or proposed merger."

**B.   Dobkin Tips Braun about Linear's Merger.**

35. Dobkin and Braun were close friends. Dobkin regularly communicated with Braun and took her on trips and to concerts and dinners.

36. Dobkin also provided Braun with financial support. Between September 2015 and March 2021, Dobkin paid Braun approximately $17,000, including expenses for Braun's son. Between approximately March 2014 and March 22, 2016, Dobkin gifted Braun's two sons a total of 3,500 shares of Linear stock, which were worth approximately $185,000 at the time she sold them in 2015 and 2016.

37. Braun knew that Dobkin was a senior executive at Linear. Dobkin had talked with Braun about Linear, and had brought her to several social events for Linear employees.

38. Before 2016, Braun had no prior investment experience other than her June 2015 sales of some of the shares Dobkin had gifted her sons. Braun had never purchased any Linear securities, let alone options, until after Dobkin learned of the Linear merger offer.

39. On April 8 and 9, 2016, Dobkin tried to reach Braun by telephone. Approximately 15 minutes after the April 9, 2016 call, Braun spoke to Dobkin by telephone.

40. On April 11, 2016, Braun called the brokerage firm where she held the stock Dobkin had gifted her sons and asked to open a personal account. On a recorded call with the brokerage representative, Braun said that she wanted to buy Linear call options. Braun said Linear was a local

company she had been following, that she believed it was innovative and would "thrive," and that she expected its stock to go up. Braun asked the representative how long it would take to open an account and get approval to trade options. The representative said an account could be opened in a few hours and then it would take two or three days for options approval.

41. On April 13, 2016, Braun called the brokerage firm again and said she had opened an account and requested approval to trade options. She told the representative that she had a "family friend" who advised her to trade options. The brokerage firm initially denied her request for approval to trade options because she was unable to demonstrate an understanding of options trading. Braun protested: "[B]ut I want to. And my professional help told me to do so. So he thinks that would be a great idea."

42. Shortly after her call with the brokerage firm, Braun called Dobkin and then texted him the following day.

43. On April 15, 2016, Braun called the brokerage firm again, requested approval to trade options, and referred to her "amazing advisors." Braun told the representative she was annoyed that she had been declined for options trading and that she did not want to wait to buy the Linear call options because she was concerned the stock price would change and she would lose out.

44. This time, the brokerage representative approved Braun's request and she immediately purchased 55 out-of-the-money call options with a strike price of $46 and a May 20, 2016 expiration date. Linear's stock had closed at $44.80 on April 14, 2016. Those options expired out of the money, or worthless, on May 19, 2016, and Braun lost $4,781.46 on the trading.

45. Dobkin and Braun communicated by phone several times in May and June 2016. They also got together in person. Dobkin took Braun to a May 13, 2016 event in Linear's suite at Mountain Winery with other Linear executives. On July 9, 2016, Dobkin called Braun on the telephone.

46. On July 15, 2016, Braun purchased 42 out-of-the-money Linear call options with a strike price of $49 and an August 19, 2016 expiration date. Linear's stock had closed at $48.50 on July 14, 2016.

47. On July 26, 2016, at approximately 11:53 am PDT, shortly after a news article reported rumors about the merger and NASDAQ halted trading, and while Linear's stock price was increasing 29% to $62.49, Dobkin called Braun.

48. Two minutes later, at approximately 11:55 am PDT, on the same date, Braun called her brokerage representative and said she wanted to sell her Linear options and the Linear stock in her sons' accounts. The brokerage representative told Braun that trading in the stock had been halted because of the news of a deal. Braun expressed surprise and claimed, "I didn't see that."

49. Braun then placed an order to sell the 42 call options when Linear stock resumed trading.

50. At approximately 12:34 pm PDT, on the same date, Braun called the brokerage firm and placed orders to sell the Linear stock in her sons' accounts. Braun told the brokerage representative that she saw news about the merger and was excited. She said, "I was pretty sure I could make money on a call option . . . I didn't think I could make this much."

51. On July 27, 2016, the day after the merger was announced, Braun sold the 42 Linear call options that she bought on July 15 for realized profits of $41,826.13.

C. **Dobkin Tips Fiorillo about Linear's Merger.**

52. Dobkin and Fiorillo were friends and spoke by telephone regularly. Dobkin had been close to Fiorillo's father before he had passed away.

53. Dobkin also dined at Fiorillo's restaurant approximately once a month during the period from February 2016 through August 2016.

54. In addition, in emails with his broker in February 2016, Fiorillo said a "family friend" had offered to gift shares of Linear stock to Fiorillo's children.

55. As of May 2016, Fiorillo had limited trading experience and had never previously purchased Linear stock or any type of options.

56. As set forth above, on May 27, 2016, Dobkin participated in meetings between the management teams of Linear and Analog about the merger.

57. On May 31, 2016, Dobkin spoke with Fiorillo on the telephone.

58. On June 3, 2016, Fiorillo purchased a total of 1,015 shares of Linear stock in his and

COMPLAINT 8

his mother's brokerage accounts.

59. On the same date, Fiorillo also purchased 22 Linear call options in his wife's brokerage account, which were set to expire on August 19, 2016.

60. On June 17, 2016, Fiorillo purchased additional Linear call options in his wife's brokerage account, which were also set to expire on August 19, 2016.

61. Later that morning, Dobkin and Fiorillo spoke on the telephone.

62. On July 6, 2016, Dobkin and Fiorillo spoke on the telephone.

63. On or about July 12, 2016, Dobkin dined at Fiorillo's restaurant.

64. On July 12 and 13, 2016, Fiorillo sold the Linear options he had bought in his wife's brokerage account in June, and purchased 205 out-of-the-money Linear call options. These options were also set to expire on August 19, 2016 and had strike prices as high as $55, when Linear's stock had closed at $47.67 and $48.41 on July 11 and 12, respectively.

65. On July 13, 2016, Fiorillo also purchased a total of 1,180 additional shares of Linear stock in his and his mother's brokerage accounts.

66. On July 15, 2016, Fiorillo again spoke with Dobkin on the phone.

67. On July 20, 2016, Fiorillo purchased additional out-of-the-money call options in his wife's brokerage account. These options were set to expire September 16, 2016 and had a strike price of $55, when Linear's stock had closed at $48.35 on July 19, 2016.

68. On July 26, 2016, at approximately 11:55 am PDT, shortly after a news article reported rumors of the merger and two minutes after calling Braun, Dobkin called Fiorillo. Fiorillo then immediately called his broker. Dobkin and Fiorillo communicated by telephone several more times on the afternoon of July 26, 2016.

69. On July 27, 2016, the day after the merger was announced, Fiorillo sold the options and shares in his, his wife's, and his mother's brokerage accounts, realizing profits of $210,256.03.

70. On December 23, 2016, the Financial Industry Regulatory Authority ("FINRA") sent a standard identification letter to Linear in connection with a review of suspicious trading in the securities of Linear. The letter listed Fiorillo, his wife, and his mother, among others, as those who had engaged in suspicious trading.

71. On January 10, 2017, Linear management gave Dobkin the FINRA Letter and asked whether he had knowledge of any of the listed names.

72. Despite his friendship and frequent phone calls with Fiorillo, including approximately seven phone calls in the preceding four weeks, Dobkin reported that he knew Fiorillo and his mother only as a customer at the restaurant and that "[a]ny contact was ordering food." He denied knowing how Fiorillo could have learned anything about the merger.

**D.    Fiorillo Tips Gregersen about Linear' Merger.**

73. Fiorillo and Gregersen are close friends. They communicated frequently during the relevant period, calling each other dozens of times between May 2016 and July 26, 2016.

74. Fiorillo and Gregersen had trading accounts through the same brokerage representative. At some point before 2014, Fiorillo referred Gregersen to his brokerage firm and suggested he open his account with the same representative.

75. At approximately 10:18 pm PDT on the evening of July 12, 2016, the same day Dobkin dined at Fiorillo's restaurant, Fiorillo and Gregersen spoke on the telephone. They also spoke twice the morning of July 13, 2016.

76. After speaking with Fiorillo on July 13, 2016, Gregersen purchased 100 out-of-the-money Linear call options that were set to expire August 19, 2016, and had strike prices as high as $55, well above Linear's $48.41 closing price on July 12.

77. Gregersen had limited experience trading equities and no prior experience purchasing options or Linear securities before the purchases at issue here.

78. On July 27, 2016, the day after the merger was announced, Gregersen sold those options and realized profits of $70,083.24.

**E.    Fiorillo Tips His Sister and Brother-In-Law about Linear's Merger.**

79. Fiorillo and his sister have a close relationship. They are siblings in a close-knit family. They are also in business together, co-managing the family restaurant, as well as the pool hall started by their father.

80. Fiorillo and his sister shared information about their respective finances. For example, they both had bank and credit card accounts at the same bank, their primary mobile phone

accounts were both in the name of and paid for by the restaurant, and Fiorillo referred his sister to her brokerage firm.

81. Upon information and belief, Fiorillo's sister knew Dobkin (who dined at the restaurant regularly when she was the manager there) and knew that Fiorillo was friends with Dobkin.

82. On July 15, 2016, Fiorillo and Dobkin spoke by telephone.

83. On July 18, 2016, Fiorillo's sister opened a brokerage account at the same brokerage firm as Fiorillo's wife, based on a referral from Fiorillo.

84. Fiorillo's sister deposited $15,000 into that account and invested the entire amount in Linear stock on July 19 and 20, 2016, the same time that Fiorillo was purchasing Linear options in his wife's brokerage account.

85. Fiorillo's sister has no known history of purchasing Linear stock or any other security prior to opening the brokerage account on July 16, 2016.

86. On July 20, 2016, the same day that Fiorillo's sister bought Linear stock, his brother-in-law bought 205 shares of Linear stock.

87. Prior to July 2016, Fiorillo's brother-in-law did not trade very often and rarely, if ever, traded individual stocks. The brother-in-law's brokerage accounts held only mutual and money market funds that he had owned since at least 2014. The brother-in-law had never traded Linear securities prior to July 2016.

88. On July 27, 2016, the day after the merger announcement, Fiorillo's sister and brother-in-law sold their stock for realized profits of $3,419.73 and $1,757.59, respectively, for a total of $5,177.32.

### CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act
and Rules 10b-5 Thereunder**

89. The Commission realleges and incorporates by reference paragraphs 1 through 88, as though fully set forth herein.

90. Dobkin learned material, non-public information about the Linear merger as a result

of his employment, and he owed a fiduciary or similar duty of trust and confidence to Linear and its shareholders to keep the information confidential and refrain from tipping the information to others. In breach of that duty, Dobkin communicated material, non-public information to Braun and Fiorillo, knowing, or having a reasonable expectation or recklessly disregarding, that they would use the information in connection with securities trading. Dobkin communicated material nonpublic information to Braun and Fiorillo in exchange for a personal benefit or with the expectation of receiving a benefit.

91. Braun, Fiorillo, and Gregersen traded and/or tipped others to trade on the basis of material nonpublic information despite knowing, or being reckless in not knowing, that the information was material and nonpublic. Braun, Fiorillo, and Gregersen knew, were reckless in not knowing, should have known, or consciously avoided knowing that the material nonpublic information was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence. Braun, Fiorillo, and Gregersen knew, were reckless in not knowing, should have known, or consciously avoided knowing that the material nonpublic information was disclosed or misappropriated in exchange for a personal benefit or with the expectation of receiving a benefit.

92. By engaging in the conduct described above, Dobkin, Braun, Fiorillo, and Gregersen, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

93. By reason of the conduct described above, Defendants, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

94. Defendants' conduct charged herein occurred within any statute of limitations (as

tolled by agreements) that may be applicable to any claims or relief sought in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

**I.**

Enter a Final Judgment permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Enter a Final Judgment directing Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**III.**

Enter a Final Judgment imposing an officer and director bar against Dobkin pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**V.**

Grant such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

| | | |
|---|---|---|
| 1 | | Respectfully submitted, |
| 2 | Dated:  December 1, 2021 | /s/ Alyssa A. Qualls |
| 3 | | Alyssa A. Qualls (IL Bar No. 6292124) |
| | | Email:  Quallsa@sec.gov |
| 4 | | Michael Foster (IL Bar No. 6257063) |
| | | Email:  Fostermi@Sec.Gov |
| 5 | | Brian D. Fagel (IL Bar No. 6224886) |
| | | Email:  Fagelb@Sec.Gov |
| 6 | | Peter Senechalle (IL Bar No. 6300822) |
| 7 | | Email:  Senechallep@Sec.Gov |
| 8 | | Attorneys for Plaintiff |
| | | United States Securities and Exchange Commission |
| 9 | | |
| 10 | | 175 West Jackson Blvd., Suite 1450 |
| | | United States Securities and Exchange Commission |
| 11 | | Chicago, Illinois 60604 |
| | | Telephone: (312) 353-7390 |
| 12 | | Facsimile: (312) 353-7398 |